## KOSMERL v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Seventh Circuit.
February 18, 1928.

No. 3933.

1. **Internal revenue** ☞7(11)—**Profits in payment of notes for price of mining property at maturity are taxable (Revenue Act 1921, § 213 [a]; Comp. St. § 6336⅛ff).**

Gains, income, or profits, in payment of installment notes for price of mining property at maturity are taxable under Revenue Act 1921, § 213 (a) being Comp. St. § 6336⅛ff, defining such gains, etc., as those derived from "dealings in property, whether real or personal, growing out of the ownership or use or interest in such property" or "from any source whatever."

2. **Internal revenue** ☞7(11)—**Payment of notes for mining property at maturity held taxable profit to extent of difference between face and actual value on their date (Revenue Act 1921, § 202 [a] [b], par. 1, § 212 [a], and § 213 [a], being Comp. St. §§ 6336⅛bb, 6336⅛f, 6336⅛ff).**

In payment of installment notes for price of mining property at maturity, there was gain, profit or income, taxable under Revenue Act 1921, § 202 (a) (b), par. 1, section 212

(a), and section 213 (a), being Comp. St. §§ 6336⅛bb, 6336⅛f, 6336⅛ff, to extent of difference between face value and actual worth of notes on their date, though they were then capital assets of taxpayer.

3. **Internal revenue** ⊜⇒7(11)—**Plain unambiguous contract to sell mining property for cash and notes should not be regarded as executory until payment of price in ascertaining taxable profit in payment of notes (Revenue Act 1921, § 202 [a] [b], par. 1, § 212 [a], and section 213 [a], being Comp. St. §§ 6336⅛bb, 6336⅛f, 6336⅛ff).**

Plain unambiguous contract, executed' in good faith before enactment of income tax laws, to terminate mining lease and make absolute sale of property to lessee for consideration partly in cash and partly in well secured negotiable notes, should not be regarded as executory until payment of price for purpose of ascertaining taxable profit in payment of notes at maturity under Revenue Act 1921, § 202 (a) (b), par. 1, section 212 (a), and section 213 (a), being Comp. St. §§ 6336⅛bb, 6336⅛f, 6336⅛ff.

Petition for Review of Order of United States Board of Tax Appeals.

Petition by Francis S. Kosmerl to review an order of the United States Board of Tax Appeals sustaining an assessment of taxes by the Commissioner of Internal Revenue. Order affirmed.

Guy Chase, of St. Paul, Minn., for petitioner.

M. N. Fisher, of Washington, D. C., for respondent.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge. Review of order of Board of Tax Appeals sustaining assessment of taxes against petitioner for 1921 and 1922.

In 1903 the fee owners of the Kosmerl iron mine property made a lease of it for a term of 51 years, whereby the compensation to the lessors was to be a royalty of 35 cents per ton of ore mined, with minimum royalty of $17,500 for the first year, $35,000 for the second, and $52,500 for each of the succeeding years of the term. There was paid in advance a royalty of $230,000, to be applied at the rate of 10 cents per ton on the first 2,300,-000 tons mined. The lessee removed no ore under the lease, but made all the stipulated minimum payments to December 31, 1912. January 1, 1913, the owners entered into a contract with the lessee for sale to it of the property, the agreed price paid therefor to be the entire tonnage of the property at 35 cents per ton, the tonnage to be estimated in man-

ner specified, and afterwards ascertained to be 12,700,000 tons, making a gross sale price of $4,445,000, from which amount there was deducted the advance payment which had been made, and the minimum royalties that had theretofore been paid under the lease. The balance was divided into 41 equal installments, one of which was paid when the papers passed, the remainder to be payable in 40 equal annual installments, evidenced by promissory notes of the purchaser, without interest, all secured by mortgage on the property; payment of the notes being further secured by guaranty of the United States Steel Corporation, which indirectly owned the stock of the purchasing corporation. The owners received of the notes in proportion to their respective interests in the property, petitioner receiving 40, each of $38,990.85, due serially in yearly intervals.

The Commissioner held that, in the payment of the two notes in question, at their maturity in 1921 and 1922, there was a profit to the taxpayer, and upon this profit as ascertained by the Commissioner the taxes in question were assessed, and afterwards sustained by the Board of Tax Appeals. For petitioner it is contended that no gain or profit is represented in the payment of the notes; that the notes, when received, became a capital asset of the taxpayer, in lieu of his prior interest in the property; that the consideration which passed from the petitioner for the notes was more valuable than the face of the notes, and that the note transaction shows no profit; also that there is no statutory warrant for such a tax.

[1] The applicable statutes are:

Revenue Act of 1921, § 212 (a), being Comp. St. § 6336⅛f:

"That in the case of an individual the term 'net income' means the gross income as defined in section 213, less the deductions allowed by section 214."

Section 213 (Comp. St. § 6336⅛ff):

"For the purposes of this title (except as otherwise provided in section 233) the term 'gross income'—

"(a) Includes gains, profits, and income derived from salaries, wages, or compensation for personal service (*  *  *), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or prof-

its and income derived from any source whatever."

Section 202 (Comp. St. § 6336⅛bb):

"(a) The basis for ascertaining the gain derived or loss sustained from a sale or other disposition of property, real, personal, or mixed, acquired after February 28, 1913, shall be the cost of such property; except that—* * *

"(b) The basis for ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, acquired before March 1, 1913, shall be the same as that provided by subdivision (a); but—

"(1) If its fair market price or value as of March 1, 1913, is in excess of such basis, the gain to be included in the gross income shall be the excess of the amount realized therefor over such fair market price or value. * * * *"

With the statute defining gains, profits, and income to be such as are derived from "dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property," concluding with the very inclusive clause "gains or profits and income derived from any source whatever," we do not grasp the logic of the contention that gains, income or profits, if appearing in these transactions, are not covered by the statute.

[2] In Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, the court said: " 'Income may be defined as the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets." These negotiable instruments were capital assets of the taxpayer on March 1, 1913, and when paid in 1921 and 1922 there was a conversion of them into cash. Whether in this conversion there was profit or gain depends either upon the value of the notes as of March 1, 1913, or the value of the consideration which the taxpayer parted with in the transaction wherein he received the notes. It happens in this case that whichever is applicable the result is substantially the same. Indeed, in case taxable profits appear, the amounts fixed by the Commissioner are concededly correct.

For petitioner a witness testified generally that at the time the notes were given the ore body was worth more than 35 cents per ton. But the ore at that time was plainly not worth that much to the owners, who had optioned it under the lease at 35 cents a ton, not payable in cash, but as and when it should be mined, over a period which, on January 1, 1913, had yet 41 years to run; so that, while the lessee had the right to exhaust the property at 35 cents per ton, this might not, and probably would not, have been payable until many years after the date when the lease was abandoned and the sale consummated. So it appears that the actual consideration which passed from the owners was not a present 35 cents per ton, but that price over a period up to 41 years thereafter, thus greatly reducing the 35 cents per ton value of the consideration which passed in payment for the notes.

And so with respect to the notes themselves, which by their terms matured up to 40 years from their date, without interest. That the notes were good is quite beyond dispute—good, however, only for their face value at maturity, but surely not good for their face value when made. That a note, however absolutely good the security, due 40 years from its date, without interest, is not worth its face at time of making, is apparent from the mere statement. And so with the notes in question, paid in 1921 and 1922, eight and nine years from their date. Conceding these notes to have been capital assets of the taxpayer on their date, they were capital assets not for their face value but for the materially less amount which the notes were then actually worth; and in their payment at maturity there was plainly gain, profit, or income to the extent of the difference.

In Platt v. Bowers (D. C.) 13 F.(2d) 951, the court dealt with a very similar situation, and held that while the annually maturing obligations represented capital assets, and were not taxable as gains, profits, or income, yet where the obligations were for serial annual payments without interest, under the acts of 1918 (40 Stat. 1057) and 1921 there was, upon conversion of the obligations through their payment, profit to the extent of the difference between the value of the obligations on March 1, 1913, and the amount so realized thereon.

We have been referred to the English case of Foley v. Fletcher, 3 Hurl. & N. 769, as sustaining a contrary view. But in Merchants' Loan & Trust Co. v. Smietanka, 255 U. S. 509, 41 S. Ct. 386, 65 L. Ed. 751, 15 A. L. R. 1305, where the right was upheld to tax gain or profit derived from sale of capital assets, the Supreme Court said: "The British income tax decisions are interpretations of statutes so wholly different in their wording from the acts of Congress which we are con-

sidering that they are quite without value in arriving at the construction of the laws here involved."

[3] It is suggested that, looking through the form of the transaction, its essence was a contract, executory until the purchase price for the property was paid. If this were so, a different basis for ascertainment of profit, and the tax thereon, might be necessary. But we need not speculate on the extent, if any, to which a tax on such a basis would differ from that imposed. The parties themselves, doubtless in good faith, and without thought of income taxes, for which there was then no statutory warrant, entered into this plain, unambiguous transaction which does not require or admit of explanation or construction. They made a contract agreeing to terminate the lease, to make an absolute sale of the property for consideration, partly in cash and partly in well secured negotiable notes, and in pursuance of the contract the deed, notes, and other papers were exchanged, the lease canceled, and the executory contract closed. No reason is perceived why, for taxing purposes, the transaction should be regarded as essentially different from what the parties to it intended and assumed it to be.

The order of the Board of Tax Appeals is affirmed.